IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ELAINE ESQUIBEL,

       Plaintiff,

      vs.                      NO. CIV 04-956 BB/LFG

JOHN E. POTTER, Postmaster General,
UNITED STATES POSTAL SERVICE,

       Defendant.

### DEFENDANT'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

     COMES NOW Defendant John E. Potter, Postmaster General,
United States Postal Service, by and through undersigned counsel
of record, and for his Proposed Findings of Fact and Conclusions
of Law states as follows:

### Findings of Fact

     1.  Plaintiff Elaine Esquibel (Ms. Esquibel) raises claims
in this action that she was discriminated against on the basis of
disability and religion in violation of the Rehabilitation Act
and Title VII and that she was subjected to a hostile work
environment on those bases as well.  (Complaint, Pre-Trial
Order).

     2. Ms. Esquibel was employed as a clerk by the United States
Postal Service (USPS) in Espanola, New Mexico, on a part-time
flexible basis from August 29, 1998, until her resignation on
August 6, 2003.  (Testimony of Ms. Esquibel).

3.   Ms. Esquibel's immediate supervisor throughout her employment with the USPS was Jose Sanchez (Mr. Sanchez). (Testimony of Ms. Esquibel & Mr. Sanchez).

4.   David Ojeda (Mr. Ojeda) was the Postmaster of the Espanola Post Office during the relevant time period for this lawsuit from the fall of 2002 through the date of Ms. Esquibel's resignation.  (Testimony of Mr. Ojeda).

### LWOP at Time of Mother's Death

5.   Ms. Esquibel's mother became ill in the late fall of 2002 and required regular dialysis.  (Testimony of Ms. Esquibel).

6.   Mr. Sanchez and Mr. Ojeda were aware that Ms. Esquibel needed intermittent leave to care for her mother's dialysis, which was granted. (Testimony of Mr. Ojeda & Mr. Sanchez)

7.   USPS leave policies require that the employee obtain advance approval of leave except for unexpected illness or injuries.  (USPS Exh. L).

8.   Even in situations involving unexpected illness or injury, including that of a family member, the employee must notify the supervisor as soon as possible of the nature of the illness or injury and the expected duration of absence.  (USPS Exh. L).

9.   If insufficient information is submitted in the supervisor's opinion, the employee must provide additional information upon request by the supervisor.  (USPS Exh. L).

10.   Medical documentation is required for any leave requested due to illness or injury in excess of three days. (USPS Exh. L).

11.   Failure to comply with these procedures can result in the supervisor charging the absence as absence without leave (AWOL) or leave without pay (LWOP).   (USPS Exh. L).

12.   AWOL is for unauthorized absences and can potentially lead to disciplinary action while LWOP indicates authorized leave in non-pay status.   (USPS Exh. L).

13.   On or about December 27, 2002, Ms. Esquibel's mother was hospitalized in a gravely ill condition.   She died on January 1, 2003.   (Testimony of Ms. Esquibel).

14.   Neither Mr. Sanchez nor Mr. Ojeda was aware at that time that Ms. Esquibel's mother was gravely ill, and only learned of this after her death. (Testimony of Mr. Ojeda & Mr. Sanchez)

15.   Ms. Esquibel was scheduled to work beginning at 3:00 a.m. on December 28, 2002, but she did not telephone Mr. Sanchez. (Testimony of Mr. Sanchez)

16.   Sometime later that morning, Ms. Esquibel's daughter delivered a note at the Espanola Post Office from Hilary Ortega (Ms. Ortega), a physician's assistant at Pojoaque Family Practice, P.A., concerning Ms. Esquibel.   The note stated:   "Due to a current medical condition we are recommending that this patient take a 1-2wk leave of absence from work.   We will

-3-

reevaluate her medical condition in 2 wks." (Testimony of Ms. Esquibel; USPS Exh. B).

17.  The note did not disclose the nature of Ms. Esquibel's medical condition; it stated that the leave was for her own unspecified condition, not the condition of her mother.  The note also did not disclose that her mother was gravely ill. (Testimony of Mr. Sanchez; USPS Exh. B).

18.  Mr. Sanchez determined the note to be unacceptable and listed Ms. Esquibel as Absent Without Leave (AWOL)on December 27 and 28, 2003. (Testimony of Mr. Sanchez; USPS Exh. A-2).

19.  Mr. Sanchez then left on his annual hunting trip and did not return to work until a week later. (Testimony of Mr. Sanchez).

20.  Ms. Esquibel contacted Mr. Ojeda after January 1, 2003, and informed him that her mother had passed away. (Testimony of Mr. Ojeda).

21.  Ms. Esquibel did not tell Mr. Ojeda that she had any medical condition at that time. (Testimony of Mr. Ojeda).

22.  Mr. Ojeda told Ms. Esquibel to take whatever time she needed before returning to work.  However, she did not request the use of sick leave, annual leave or FMLA leave. (Testimony of Mr. Ojeda)

23.  Mr. Ojeda indicated in a note to Mr. Sanchez that she would return to work on January 11, 2003, and directed him to

list her on Leave Without Pay (LWOP) status from December 28, 2002, through January 10, 2003. (Testimony of Mr. Ojeda; USPS Exh. A2).

24.  Ms. Esquibel's AWOL status was later changed to LWOP; she was not paid for any hours during that time because she was not working and was on LWOP.  Other employees were also given AWOL or LWOP by Mr. Ojeda and Mr. Sanchez when they had unscheduled leave.  (Testimony of Mr. Ojeda & Mr. Sanchez).

25.  Nothing in Ms. Esquibel's medical records indicates that she had any medical condition at that time or was even being treated by Pojoaque Family Practice.  (USPS Exh. F).

26.  While Ms. Esquibel asserts that she was undergoing stress, nothing in the December 27, 2002, note or the medical records indicate that she had been diagnosed with stress or was being treated for stress.  (USPS Exh. F).

27.  Further, Ms. Ortega was not trained or licensed as a psychiatrist, psychologist, counselor or other mental health care provider.  (Testimony of Ms. Ortega).

28.  Ms. Esquibel has never been treated by either a psychiatrist or psychologist. (Testimony of Ms. Esquibel).

29.  Ms. Esquibel did not submit documentation for leave pursuant to the Family and Medical Leave Act (FMLA) during the time when her mother was ill.  (Testimony of Mr. Sanchez).

30.  Documentation must be submitted and approved for FMLA

leave pursuant to USPS policies.  Ms. Esquibel has no
documentation showing that she was approved for FMLA leave during
the time when her mother was ill.  (Testimony of Ms. Esquibel).

31.  Ms. Esquibel returned to work on January 11, 2003.
(Testimony of Ms. Esquibel).

32.  After Ms. Esquibel returned to work, she did not
request that Mr. Sanchez change her payroll records to reflect
the use of sick leave, annual leave or FMLA leave in lieu of
LWOP. (Testimony of Mr. Sanchez).

### Oral Counseling on Leave

33.  Mr. Sanchez verbally counseled Ms. Esquibel on March 4,
2003, about her attendance.  He gave similar counseling to other
employees who had not followed leave approval requirements. The
verbal counseling did not result in any change in pay or
otherwise alter the terms and conditions of Ms Esquibel's
employment with the USPS in any significant way. (Testimony of
Mr. Sanchez; USPS Exh. A-1).

34.  During the counseling, Ms. Esquibel mentioned that her
arm was hurting and stated she would provide documentation for
leave. (Testimony of Mr. Sanchez; USPS Exh. A-1).

35.  Ms. Ortega was seen by Ms. Ortega, the physician's
assistant at Pojoaque Family Practice, the following day and
provided Ms. Esquibel with a note on March 19, 2003, which
recommended rest for 1-2 weeks.  (USPS Exh. C & F).

36.  Ms. Esquibel did not provide the note to her supervisor, Mr. Sanchez, or request leave at that time.  She continued to work. (Testimony of Ms. Esquibel & Mr. Sanchez).

37.  Ms. Ortega also prescribed prednisone for Ms. Esquibel, but she did not take the medication because of concerns about its side effects which had been described to her by co-workers. (Testimony of Ms. Esquibel).

## Alleged Religious Discrimination

38.  At some point in time,  Ms. Esquibel made a complaint to Mr. Ojeda regarding Mr. Sanchez' treatment of her because of her religion, which is Christian.  (Testimony of Ms. Esquibel & Mr. Ojeda).

39.  Mr. Sanchez denied making any comments relating to Ms. Esquibel's religion. (Testimony of Mr. Sanchez & Mr. Ojeda).

40.  Mr. Ojeda spoke with Mr. Sanchez concerning same and ordered him to cease any such behavior if in fact it was taking place.  (Testimony of Mr. Ojeda).

41.  Mr. Ojeda received no further complaints from Ms. Esquibel about such comments by Mr. Sanchez. (Testimony of Mr. Ojeda).

## Proposed Transfer to the Los Alamos Post Office

42.  During April or May 2003, Ms. Esquibel learned from a friend at the Los Alamos Post Office, that there might be a position available for a clerk in Los Alamos since they were

short-handed.  (Testimony of Ms. Esquibel).

43.  The position would not result in any change in pay or grade and had similar essential functions as her existing position as a clerk.  (Testimony of Ms. Esquibel).

44.  Tammy Duran (Ms. Duran), a supervisor at the Los Alamos Post Office and a friend of Ms. Esquibel's, spoke to Art Martinez (Mr. Martinez), the Officer in Charge (OIC), about Ms. Esquibel. Mr. Martinez was supportive of the proposed transfer.  (Testimony of Mr. Martinez & Ms. Duran).

45.  Ms. Esquibel, at Ms. Duran's request, telefaxed a letter of interest in the position.  (Testimony of Ms. Duran).

46.  Before Mr. Martinez could accept a transfer to the window clerk position, he had to first receive approval from the Albuquerque District Office.  Her existing Postmaster also had the right to hold any proposed transfer for ninety days even after District Office approval.  While he was OIC at the Los Alamos Post Office, Mr. Martinez was not given approval by the District to fill any positions by transfer or otherwise. (Testimony of Mr. Martinez & Mr. Ojeda)

47.  Mr. Ojeda had a telephone conversation with Mr. Martinez in which he expressed some concern about Ms. Esquibel's attendance record.  Mr. Ojeda was also short-handed at the Espanola Post Office during this time and does not recall approving any transfers or reassignments since his office was

also under hiring restrictions from the District. (Testimony of Mr. Ojeda)

48.  Both Mr. Ojeda and Mr. Martinez would have to agree to an immediate reassignment in writing, as would the USPS Albuquerque District Office. (Testimony of Mr. Ojeda & Mr. Martinez)

49.  None of the written documentation or the necessary approvals were ever completed or obtained. (Testimony of Mr. Ojeda & Mr. Martinez)

50.  Ms. Esquibel planned to start on this reassignment on or about May 17, 2003. (Testimony of Ms. Esquibel)

51.  Ms. Esquibel did not inform Mr. Ojeda that the request for reassignment was as an accommodation for any medical condition, nor was Mr. Ojeda aware of any medical condition at the time of her request or of any stress due to her interactions with Mr. Sanchez.  (Testimony of Mr. Ojeda)

### FMLA Requests of May 5 and June 6, 2003

52.  Nothing in Ms. Esquibel's medical records through the date of her resignation, indicated that she was ever diagnosed or treated for stress or stress related medical problems.  (USPS Exhs. F and G).

53.  Nor was Ms. Esquibel ever treated by a psychiatrist, a psychologist, counselor or other mental health care provider for the time period in question.  (Testimony of Ms. Esquibel).

54.   Ms. Esquibel never requested any accommodation for her tendinitis from the USPS, much less any accommodation for stress. (Testimony of Ms. Esquibel, Mr. Ojeda & Mr. Sanchez).

55.   On May 5, 2003, Ms. Esquibel presented to Mr. Sanchez a note from Ms. Ortega, the physician's assistant at Pojoaque Family Practice, indicating that she had "severe elbow tendenitis" and that "[i]t is imperative she take 2 wks off to ice and rest these joints."  (USPS Exh. No. D-1).

56.   Ms. Esquibel requested FMLA leave for the two week period beginning May 5, 2003.  The request was forwarded to the USPS District Office, and the nurse there asked for additional information concerning Ms. Esquibel, including a FMLA certification of health care provider.  Mr. Sanchez required that she provide this documentation to him by May 27,2003. (Testimony of Mr. Sanchez; USPS Exh. D-3).

57. Ms. Esquibel obtained the FMLA Certification of Health Care Provider from Ms. Ortega on May 22, 2003.  Ms. Ortega stated that Ms. Esquibel ". . . is unable to perform her work duties at this time" with a probable duration "through 6/7/03."  Ms. Ortega further responded to the question of whether Ms. Esquibel was unable to perform work of any kind:  "yes at this time." (Testimony of Ms. Ortega; USPS Exh. D-4).

58.  Based on this documentation, the USPS FMLA Coordinator determined that Ms. Esquibel had "[a] serious health condition

that makes you unable to perform the basic essentials of your job" and was entitled to FMLA leave retroactively from March 19 through June 7, 2003.  (USPS Exh. D-5).

59.  On June 6, 2003, Ms. Esquibel provided Mr. Sanchez another note from Ms. Ortega requesting that she be excused from work for an additional 6-8 weeks until August 7, 2003. (Testimony of Ms. Ortega & Ms. Esquibel; USPS Exh. D-6).  Mr. Sanchez rejected this note as inadequate and informed Ms. Esquibel in writing that he was placing her on AWOL status beginning June 7, 2003, unless she cured the documentation problem.  (Testimony of Mr. Sanchez; USPS Exh. D-7).

60.  On June 19, 2003, Ms. Esquibel received a memorandum from Roland Boudreau, FMLA Coordinator, stating that the FMLA Certification needed to be signed by a physician.  (USPS Exh. D-8).

61. On June 19, 2006, Ms. Ortega provided a further FMLA certification which again stated that Ms. Esquibel was unable to perform work of any kind through August 7, 2003  (Testimony of Ms. Ortega; USPS Exh. D-9).

62.  Based on this certification, the USPS FMLA Coordinator on June 24, 2003, found that Ms. Esquibel was "unable to perform the basic essentials" of her job and extended the use of FMLA leave from June 7 through August 7, 2003.  (USPS Exh. D-10).

63.  Thus, Ms. Esquibel had FMLA leave available for any

AWOL or LWOP she was charged from March 19 through August 7, 2003, up to a total of 12 weeks.  Ms. Esquibel in fact was paid for the entire twelve weeks from May 5 through August 7, 2003. (Testimony of Ms. Esquibel).

64.  At some point in the summer, Mr. Ojeda told Ms. Duran and Margie Martinez (Ms. Martinez), also one of Ms. Esquibel's friends, when they came to pick up one of her checks that they had to have written authorization from Ms. Esquibel to do so, which was required by USPS procedures.   Mr. Ojeda also allegedly said to them that he did not understand why Ms. Esquibel couldn't at least box mail despite her tendonitis. (Testimony of Mr. Ojeda, Ms. Duran & Ms. Martinez)

65.  Ms. Esquibel was referred to Rocky Mountain Orthopedics for physical therapy in June 2003.  (USPS Exh. F, GOV00111MED). Ms. Esquibel stated that her "avocational interest include basketball & swimming," both activities involving repetitive motions.  (USPS Exh. G).

66.  Ms. Esquibel reported significant improvement in her tendonitis by the end of July 2003 due to the physical therapy and even provided Rocky Mountain Orthopedics with a testimonial statement.  (USPS Exh. G, GOV00127MED and GOV00127MED).

67.  Ms. Esquibel was no longer in physical therapy when she resigned in August 2003 because she was feeling better.  Indeed, Ms. Esquibel did not receive any further treatment for her

tendonitis subsequent to her resignation.  (Testimony of Ms. Esquibel).

## Ms. Esquibel's Resignation

68.  Ms. Esquibel submitted a written statement of resignation to Mr. Ojeda on August 6, 2006.  The reason stated was that her father was now ill, and she wanted time to care for him and did not want to go through any "hassles" again over the use of her leave.  (Testimony of Ms. Esquibel; USPS Exh. H-1).

69.  Ms. Esquibel did not make any assertion in the statement that she was disabled, required an accommodation or had been harassed due to her religion.  (USPS Exh. H-1).

70.  Ms. Esquibel did not claim that she was constructively discharged in her Equal Employment Opportunity (EEO) complaint, nor has she made a claim to that effect in her complaint or the pre-trial order in this action.  (USPS Exh. K-5; Complaint, Pre-Trial Order).

## Ms. Esquibel's Equal Employment Opportunity (EEO) Activity

71.  Throughout the time period Ms. Esquibel was employed in the Espanola Post Office, EEO Poster 72, Equal Employment Opportunity Is The Law, was on display in the Espanola Post Office in two places:  in the break room and on the south wall. (Testimony of Mr. Ojeda; USPS Exhs. J-1 and J-2).

72.  These posters advised employees to contact an EEO

counselor within 45 days of any discriminatory act.  (USPS Exhs. J-1)

73.  The poster is one adopted pursuant to guidance from the Equal Employment Opportunity Commission (EEOC), the agency designated by Congress to enforce EEO laws and was used by the USPS nationally.  It is similar to those used by other agencies. (Testimony of Michael Westervelt).

74.  All USPS employees are provided training with respect to discrimination, harassment and similar matters on a regular basis.  (Testimony of Terry Currier).

75.  The training officer for the USPS Albuquerque District is familiar with the regular EEO and harassment training given and videos used for same; they routinely include advice to contact an EEO counselor within 45 days of any alleged discriminatory act or harassment.  (Testimony of Terry Currier).

76.  Ms. Esquibel attended training on discrimination and harassment during the course of her employment in the Espanola Post Office.  (Testimony of Terry Currier; USPS Exh. I).

77.  Ms. Esquibel remembers receiving mandatory training on more than one occasion, but does not recall what it was about. (Testimony of Ms. Esquibel).

78.  Ms. Esquibel acknowledges that there were signs posted on the bulletin board in the break room of the Espanola Post Office, but never read them and does not recall what they were

about or what they said.  (Testimony of Ms. Esquibel)

79.  Ms. Esquibel contacted an EEO counselor on October 27, 2003, which was more than 45 days after her resignation. (Testimony of Ms. Esquibel; USPS Exh. K-1).

### Alleged Damages

80.  From May 5, 2003, through the date of her retirement, Ms. Esquibel never returned to work.  However, she was paid through FMLA for that entire time and therefore incurred no loss in wages or benefits.  (Testimony of Ms. Esquibel).

81.  Shortly after she resigned from the Espanola Post Office, Ms. Esquibel was employed by Ortiz Transportation driving a 65-passenger school bus.  (Testimony of Ms. Esquibel).

82.  Her medical examination certification for that position was completed by Ms. Ortega on August 15, 2003, and showed no medical restrictions.  (Testimony of Ms. Ortega; USPS Exh. F)

83.  Ms. Esquibel is currently employed full-time as a taxi cab driver for KSL. (Testimony of Ms. Esquibel).

84.  Ms. Esquibel has not provided any documentary evidence to support her claim for lost income, future lost income, or compensatory damages. (Testimony of Ms. Esquibel)

### Conclusions of Law

### Failure to Exhaust Administrative Remedies

1.  Federal employees wishing to pursue judicial claims of discrimination in connection with their employment must first

exhaust their administrative remedies.  <u>Woodman v. Runyon</u>, 132 F.3d 1330, 1341 (10th Cir. 1997); <u>Khader v. Aspin</u>, 1 F.3d 968, 970-71 (10h Cir. 1993).

2.  Ms. Esquibel chose the most common method of administrative exhaustion which is the individual EEO complaint process.  That process is governed by the regulations promulgated by the EEOC.  29 C.F.R. Part 1614.

3.  Pre-complaint or informal counseling is the first step in that process, requiring Ms. Esquibel to consult with an agency counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action.  29 C.F.R. § 1614.105(a)(1).

4.  All of the acts about which Ms. Esquibel complains occurred well before 45 days after her resignation:  the issue concerning leave to take care of her mother, the purported transfer to the Los Alamos Post Office, and the remarks allegedly made by Mr. Sanchez concerning her religion.

5.  Being placed on AWOL status on December 28 and 30, 2002, was a discrete act.

6.  The denial of her proposed transfer to the Los Alamos Post Office in May 2003 was a discrete act.

7.  Ms. Esquibel's resignation was a discrete act.

8.  Discrete acts of alleged discrimination require separate

exhaustion.  <u>Nat'l R.R. Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002).

9.  Ms. Esquibel did not contact an EEO counselor within 45 days of being placed on AWOL status.

10.  Ms. Esquibel did not contact an EEO counselor within 45 days of being denied the transfer to the Los Alamos Post Office.

11.  Ms. Esquibel did not contact an EEO counselor within 45 days of her resignation and has never raised a claim that she was constructively discharged.

12.  Post <u>Morgan</u>, hostile work environment claims must be properly exhausted as well.  <u>Annett v. Univ. of Kansas</u>, 371 F.3d 1233, 1238 (10th Cir. 2004).  The very nature of such claims involves repeated conduct and a single act of harassment may not be actionable on its own.  <u>Morgan</u>, 536 U.S. at 115. Thus, for such claims, all actions allegedly part of a hostile workplace may be considered provided that at least "one act contributing to the claim" occurs within the 45 day period prior to a request for counseling. <u>Id</u>.

13.  Since Ms. Esquibel never returned to work after May 5, 2003, considerably more than 45 days passed before she contacted an EEO counselor.

14.  Ms. Esquibel did not timely exhaust her administrative remedies; therefore, this action is barred.

## Alleged Violations of the Rehabilitation Act

15.   In order to maintain a prima facie case under the Rehabilitation Act, 29 U.S.C. §§ 791 et seq., Ms. Esquibel must show:  (1) she was disabled within the meaning of the Act; (2) she is a "qualified individual"; and, (3) she was discriminated against because of the handicap.  Rakity v. Dillon Co., 302 F.3d 1152, 1164 (10th Cir. 2002);  Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1239 (10th Cir. 2001); Woodman, 132 F.3d at 1338.

16. A qualified individual with a disability is:

> an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds . . ., and who, with or without reasonable accommodation, can perform the essential functions of such position.

29 C.F.R. § 1630.2(m).  Essential functions means "the fundamental job duties of the employment position the individual with a disability holds . . ..  29 C.F.R. § 1630.2(n)(1).

17.   The Tenth Circuit has applied a two-part test for determining whether a person is qualified within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue.  Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

Hudson v. MCI Telecommunication Corp., 87 F.3d 1167, 1168 (10th Cir. 1996).

18.  As the Tenth Circuit has put it, "the relevant inquiry
in determining whether an employee is 'qualified' under the
amended [Rehabilitation] Act ... is whether the employee has
provided evidence that [she] can be reasonably accommodated."
Woodman, 132 F.3d at 1340.

19.  The initial burden of showing that a reasonable
accommodation exists belongs to the employee.   Zukle v. Regents
of the Univ. of Calif., 166 F.3d 1041, 1046-47 (9th Cir. 1999):

> [W]hen the plaintiff alleges a failure to accommodate, part
> of the plaintiff's initial burden includes 'showing the
> existence of a reasonable accommodation. . . In the
> employment context, '[o]nce the plaintiff has established
> the existence of a reasonable accommodation that would
> enable him or her to perform the essential functions of an
> available job, the burden switches to the defendant to show
> that this accommodation would constitute an undue hardship."
> (Cites omitted).

20.  Ms. Esquibel was not "qualified" within the meaning of
the Rehabilitation Act.  Ms. Esquibel was found to be unable to
perform any work, including the essential functions of the job of
clerk, by Ms. Ortega's certifications on May 22 and June 19,
2003.

21.  Likewise, the FMLA coordinator for the U.S. Post Office
agreed and found that Ms. Esquibel had a serious health condition
that made her unable to perform the basic essentials of her job
on May 23 and June 24, 2003.

22.  Ms. Esquibel bears the burden of showing she was able
to perform the essential functions of her job with a reasonable

accommodation. <u>Mason v. Avaya Communications, Inc.</u>, 357 F.3d 1114, 1119 (10th Cir. 2004). <u>See also Woodman</u>, 132 F.3d at 1344. "An accommodation is 'reasonable' and necessary. . . only if it enables the employee to perform the essential functions of the job." <u>Lucas v. WW Grainger, Inc</u>., 257 F.3d 1249, 1259-1260 (11th Cir. 2001).

23. Prior to May 5, 2003, Ms. Esquibel did not provide USPS with any documentation that she was suffering from any disability, although she had obtained such documentation from her medical provider on March 19, 2003.

24. Ms. Esquibel has failed to establish that she was able to perform the essential functions of the job of clerk after May 5, 2003, including the failure to produce any medical evidence that she could perform any work at all from May 5 through August 7, 2003.

25. Courts have recognized that the Rehabilitation Act "requires an 'interactive process' between the employer and the employee to determine whether a reasonable accommodation can be made." <u>Woodman</u>, 132 F.3d at 1344.

26. Ms. Esquibel never requested an accommodation; therefore, management could not respond accordingly.

27. Ms. Esquibel did not request FMLA leave until May 5, 2003. That leave was granted retroactively from March 19 through August 7, 2003.

28.   An employer may require employees seeking FMLA leave to provide certification issued by the health care provider of the employee or family member who suffers from the serious health condition.  29 U.S.C. § 2613(a).

29.   Further, "if an employee requesting to use paid leave for an FMLA-qualifying purpose does not explain the reason for the leave ... and the employer denies the employee's request, the employee will need to provide sufficient information to establish am FMLA-qualifying reason for the needed leave so that the employer is aware of the employee's entitlement."  29 C.F.R. § 825.208(e).

30.   Ms. Esquibel requested a reassignment to a clerk's position in Los Alamos but did not request this reassignment as an accommodation for her tendonitis, alleged stress or any other condition.  Even if she had, a reassignment to another clerk position in Los Alamos or anywhere else would not meet her medical restrictions since she was unable to perform **any** manual work.

31.   Ms. Esquibel has no medical or mental health evidence that she suffered from stress or any psychological impairment that met the definition of a disability under the Rehabilitation Act.

32.   Workplace stress is not a disability under the Rehabilitation Act and an employer is not required to provide a

stress-fress setting.  <u>Gonzagowski v. Widnall</u>, 115 F.3d 744, 747-48(10th Cir. 1997); <u>Pesterfield v. Tennessee Valley Auth.</u>, 941 F.2d 437, 442 (6th Cir. 1991).

33.  Even if it were, changing supervisors is not a required accommodation by an employer.  <u>Wernick v. Federal Reserve Bank of New York</u>, 91 F.3d 379, 384-85 (2nd Cir. 1996); <u>Weiler v. Household Finance Corp</u>., 101 F.3d 519, 524-25 (7th Cir. 1996).

34.  A request to change supervisors is presumed unreasonable, and burden of demonstrating that, within the particular context of the plaintiff's workplace, the request was reasonable, lies with the plaintiff.  <u>Kennedy v. Dresser Rand Co.</u>, 193 F.3d 120, 122-23 (2d Cir. 1999); <u>see also</u>, <u>Borkowski v. Valley Cent. Sch. Dist.</u>, 63 F.3d 131, 139 (2d Cir. 1995).

35.  Because Ms. Esquibel was found to have a serious health condition (bilateral tendonitis) which made her unable to perform the essential functions of her job at USPS, there was no reasonable accommodation that could have been provided in order for her to perform the essential functions of her job as a clerk after May 5, 2003.

36.  Because Ms. Esquibel did not show that she was a qualified individual with a disability under the Rehabilitation Act, her claim should be denied.

### Claim of Discrimination on Basis of Religion

37.  To establish a *prima facie* claim of disparate treatment

based on religion, the plaintiff must show that (1) she is a member of a protected class; (2) that she was subjected to an adverse employment action; (3) that there was disparity in the treatment afforded her in the terms and conditions of her employment compared to individuals not in her protected class; and, 4) that the defendant has no legitimate reasons for the allegedly disparate treatment. Dunlap v. Kansas, Dept. of Health & Env't, 211 F. Supp. 2d 1334, 1342 (D. Kan. 2002)

38.   USPS does not dispute that Ms. Esquibel is a member of a protected class with respect to her religion.

39.   "To be an adverse action, the employer's conduct must be 'materially adverse' to an employee's job status." Wells v. Colorado Dept. of Transp., 325 F.3d 1205, 1212 (10th Cir. 2003); Aquilino v. Univ. of Kansas, 268 F.3d 930, 934 (10th Cir. 2001). An adverse employment action generally occurs only when there is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." See Meiners v. Univ. of Kansas, 359 F.3d 1222, 1230 (10th Cir. 2004); Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003).

40.   The Tenth Circuit has repeatedly stated that Title VII does not make actionable the ordinary tribulations of the workplace; and, that not everything a supervisor says or does

-23-

amounts to an adverse employment action just because the employee dislikes or disagrees with it.  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).  If this were not the case, "minor and even trivial employment actions that an irritable chip-on-the shoulder employee did not like would form the basis of a discrimination suit." Id.  Mere inconveniences are not adverse employment actions.  Heno v. Sprint/United Management Co., 208 F.3d 847 (10th Cir. 2000).

41.  Requiring notes or documentation for leave is not an adverse action.  Sanchez, 164 F.3d at 533 (no adverse action for requiring a note when plaintiff was sick while other employees were not required to do so).

42.  Oral warnings or even threats are not enough.  Sanchez, 164 F.3d at 532; Wells, 325 F.3d at 1214. Even a  written reprimand is not an adverse action where no further action was taken.  Conatzer v. Medical Professional Building Services Corporation, 95 Fed.Appx. 276, 2004 WL 789801 (10th Cir. (Okla.)(90-day probation and written reprimand not tangible employment action because the reprimand was not accompanied by suspension, loss or reduction of pay, or loss of benefits); Dick v. Phone Directories Co. Inc., 2005 WL 327702 (10th Cir. Feb. 11, 2005) at *10-11; Rennard v. Woodworker's Supply, Inc., 101 Fed.Appx. 296, 2004 WL 1260309 (10th Cir. 2004) at *10.

43.  The denial of Ms. Esquibel's transfer is not an adverse

action (like an actual reassignment) where her job classification and rate of pay would have remained the same, and her proposed position was similar to those she had occupied in prior years. Wells, 325 F.3d at 1213-14 (reassignment to another project was not an adverse action where same pay and position same); Sanchez, 164 F.3d at 532 (involuntary lateral transfer did not constitute an adverse employment action when the transfer did not alter the plaintiff's responsibilities, salary or benefits).

44.   Ms. Esquibel was not subjected to an adverse employment action here since the leave requirements, oral counseling and denial of a transfer did not involve any material or significant change in the terms and conditions of her employment.

45.   Ms. Esquibel has not shown that any similarly situated employee not in her protected class was treated differently with respect to leave, counseling or denial of the transfer.

46.   Mr. Sanchez and Mr. Ojeda have articulated legitimate, non-discriminatory reasons for requiring her to document and schedule leave, for counseling her on lease issues and for denying the transfer to Los Alamos.

## Hostile Work Environment

47.   Harassment, in order to be actionable, must be because Plaintiff is a member of a protected group under Title VII or the Rehabilitation Act or in retaliation for protected activity. Meritor Savings Bank, F.S.B. v. Vinson, 477 U.S. 57 (1986);

Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

48.  Discriminatory harassment, however, is actionable only
if it is pervasive or extreme, amounting to a change in the terms
and conditions of employment and creating a hostile work
environment.  Faragher, 524 U.S. at 778; see also, Burlington
Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998); Clark County
Sch. Dist. v. Breeden, 532 U.S. 268 (2001).

49.  To establish a harassment claim, the plaintiff must
demonstrate that her workplace is "permeated with discriminatory
intimidation, ridicule, and insult" that is both **objectively** and
subjectively offensive. Penry v. Federal Home Loan Bank of
Topeka, 155 F.3d 1257,1261 (10th Cir. 1998).  The work
environment must be perceived both subjectively and objectively
as abusive based on the totality of the circumstances. See Adler
v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998).

50.  Ms. Esquibel must show that the harassment occurred
because of her religion or alleged disability.  Id.; Gross v.
Burggraf Constr. Co., 53 F.3d 1531, 1537 (10th Cir. 1995); Stahl
v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir. 1994).  If
the harassment is just general, not founded on any of these
bases, the claim is not actionable.  Bolden, 43 F.3d at 551.

51.  In determining whether an environment is objectively
hostile, the trier of fact must  consider the frequency of the
discriminatory conduct, its severity, whether it is physically

threatening or humiliating or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.  <u>Faragher</u>, 524 U.S. at 777-778.

52.  The Tenth Circuit has held that "sporadic racial slurs," or "a few isolated instances of racial enmity," do not constitute a hostile work environment.  <u>See</u> <u>Jones v. Barnhart</u>, 349 F.3d 1260, 1269 (10th Cir. 2003); <u>Bolden</u>, 43 F.3d at 551.

53.  As noted by the Supreme Court in <u>Faragher</u>, the standards for judging hostility are demanding to ensure that Title VII does not become a general civility code.  "Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing." <u>Id.</u>; <u>Oncale v. Sundowner Offshore Services, Incorporated</u>, 523 U.S. 75, 81, 118 S.Ct. 998 (1998) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview.").

54.  The few comments about her religion alleged by Ms. Esquibel (and denied by Mr. Sanchez) do not meet this objective "severe and pervasive" test, whatever Ms. Esquibel's subjetcive feelings.  Further, she made no efforts to raise her concerns with Mr. Ojeda after her initial effort when he took action to counsel Mr. Sanchez about making such comments if the allegations

were true.

55.   The single alleged comment by Mr. Ojeda to third persons indicating his lack of understanding about the extent of Ms. Esquibel's disability clearly does not met the either the objective or subjective test, since it was an isolated comment and was not even made to Ms. Esquibel.

56.   Any other alleged "harassment" about Ms. Esquibel's leave documentation after she made her supervisors' aware of her tendonitis was required by Postal Service procedures and was entirely proper.

57.   Ms. Esquibel's hostile work environment claim is without merit.

**Damages**

58.   Ms. Esquibel bears the burden of establishing and proving the amount of any award of damages. <u>Gotthardt v. Nat'l RR Pass. Corp.</u>, 191 F.3d 1148, 1158(9th Cir. 1999); <u>Armstrong v. Charlotte County Bd. Of County Com'rs.</u>, 273 F.Supp.2d 1312, 1316 (M.D. Fla. 2003).

59.   Ms. Esquibel has not established that she is entitled to recover any lost wages or benefits while she was on LWOP from December 27, 2002 until her return to work on January 11, 2003, since she did not work during that time period and did not request the use of sick leave, annual leave or FMLA leave from either Mr. Ojeda or Mr. Sanchez.

60.   Ms. Esquibel failed to mitigate any claim for damages due to lost wages or benefits while she was on LWOP from December 27, 2002 until her return to work on January 11, 2003 since she did not request the use of sick leave, annual leave or FMLA leave from either Mr. Ojeda or Mr. Sanchez.

61.   Ms. Esquibel failed to establish that she is entitled to recover any lost wages from May 5, 2003 through the date her resignation on August 7, 2003, including any time initially charged as AWOL or LWOP, since she was in fact reimbursed for all of her lost wages by use of the FMLA-approved sick leave and annual leave after she provided the required documentation.

62.   Since Ms. Esquibel has failed to exhaust or raise any administrative or judicial claim for constructive discharge, she is not entitled to any claim for lost wages and benefits, or back pay, after the date of her resignation on August 7, 2003. Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1002 (10th Cir. 1996); Derr v. Gulf Oil Corp., 796 F.2d 340, 342 (10th Cir. 1986) ("[T]he remedies of back pay and reinstatement are not available to [plaintiff] unless she was constructively discharged.").

63.   Further, any claim for lost wages and benefits, or back pay, is reduced by her re-employment shortly after her resignation for USPS.  Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 232 (1982); 42 U.S.C. § 2000e-5(g).

64.   Ms. Esquibel is not entitled to front pay since she has

made no claim of constructive discharge.  A victim of
discrimination must show either an actual or constructive
discharge in order to receive the equitable remedy of
reinstatement or front pay in lieu of reinstatement.  Mallinson-
Montaque v. Pocrnick, 224 F.3d 1224, 1236-37 (10th Cir. 2000);
Derr v. Gulf Oil Corp., 796 F.2d at 342.

     65.  In any event, since Ms. Esquibel sought employment
elsewhere and was promptly re-employed, an award of front pay is
inappropriate. Kinsey v. Legg Mason Walker, 1978 WL 18*3, 23
F.E.P. 770, 773 (D.D.C. 1978).

     66.  Ms. Esquibel has not provided any documentary or expert
evidence of any future loss of wages she allegedly incurred.
Where damages are not established with any reasonable degree of
certainty, they are speculative and should not be awarded.
Barbour v. Merrill, 48 F.3d 1270, 1280 (D.C. Cir. 1995), cert.
dismissed, 516 U.S. 1155 (1996); Grimes v. City of Fort Valley,
773 F.Supp. 1536, 1538 (M.D. Ga. 1991).

     67.  Since Ms. Esquibel has provided no evidence that she
was diagnosed or treated for any emotional distress, any claim
for emotional distress should be limited to nominal damages.
Carey v. Piphus, 435 U.S. 247, 263-64 (1978); Giles v. General
Electric Co., 245 F.3d 474, 488 (5th Cir. 2001)

### Conclusion

     68.  Judgment should be entered in favor of Defendant on all

claims including costs.

                              Respectfully submitted,

                              DAVID C. IGLESIAS
                              United States Attorney


                              JAN ELIZABETH MITCHELL
                              JOHN W. ZAVITZ
                              Assistant U.S. Attorney
                              P.O. Box 607
                              Albuquerque, New Mexico 87103
                              (505) 346-7274


        I HEREBY CERTIFY that on May 16, 2006, a true copy of the
foregoing was sent via First Class Mail to opposing counsel as
follows: Michael E. Mozes, Esq., Law Offices of Michael E. Mozes,
P.C., 5732 Osuna N.E., Albuquerque, New Mexico 87109.


                              _____
                              JOHN W. ZAVITZ
                              Assistant U.S. Attorney